738 F.2d 1074
 21 ERC 2047, 14 Envtl. L. Rep. 20,672
 STATE OF MONTANA, and Ted Schwinden, Governor of the State
of Montana; Mike Greely, Attorney General of
Montana, et al., Plaintiffs-Appellants,
v.
Peter JOHNSON, Administrator of Bonneville Power
Administration, Bonneville Power Administration,
et al., Defendants-Appellees.
 No. CA 82-3584.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 10, 1983.
Decided July 30, 1984.
 
 Janet L. Steckel, Dept. of Justice, Washington, D.C., for defendants - appellees, Peter Johnson et al.
 Tim D. Hall, Dept. of Natural Resources & Conservation, Helena, Mont., for plaintiffs-appellants.
 John L. Peterson, Butte, Mont., for defendants-appellees, Montana Power.
 Appeal from the United States District Court for the District of Montana.
 Before WRIGHT, CANBY and BOOCHEVER, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Montana sued for a declaration that Sec. 505(a)(iv) of the Federal Land Policy Management Act (FLPMA), 43 U.S.C. Sec. 1765(a)(iv) (1976), requires the Bonneville Power Administration (BPA) to obtain state certification before it constructs a ninety-mile power line across federal and nonfederal lands in Montana. In the alternative, assuming that Sec. 505(a)(iv) does not require state certification, Montana requested a declaration that Sec. 505(a)(iv) requires at least that BPA comply with the substantive provisions for environmental protection promulgated by Montana. The district court rejected both of Montana's claims. Montana appeals.
 
 
 2
 We affirm in part and reverse in part. First, we hold that Montana's appeal is ripe and not moot. Second, we affirm the district court's holding that Sec. 505(a)(iv) of FLPMA does not require that BPA obtain state certification. Third, we hold that Sec. 505(a)(iv) makes the specific substantive provisions adopted by Montana applicable to BPA's activities on federal lands. Finally, we conclude that Sec. 505(a)(iv) does not require BPA compliance with Montana's substantive provisions off federal lands.
 
 Background
 
 3
 A consortium of utilities is building two power plants at Colstrip, in southeastern Montana, and a power line west from Colstrip to Townsend, in southwestern Montana. In order to link the consortium's new power plants and power line to BPA's power grid in the Pacific Northwest, BPA is constructing a ninety-mile power line from Townsend to Hot Springs, in northwestern Montana. BPA's power line crosses public lands administered by the Secretary of Interior, national forest lands administered by the Secretary of Agriculture, and nonfederal state or private lands. On August 18, 1981, the Secretaries of Interior and Agriculture granted BPA rights-of-way across the federal lands pursuant to Title V of FLPMA, 43 U.S.C. Secs. 1761-71 (1976).
 
 
 4
 Montana filed this action on March 3, 1981, claiming that the rights-of-way issued to BPA do not comply with Sec. 505(a)(iv) of FLPMA, which provides:
 
 
 5
 Each right-of-way shall contain ... terms and conditions which will ... require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards.
 
 
 6
 Montana asserted that the rights-of-way should have contained provisions requiring BPA to obtain state certification for the Townsend to Hot Springs power line. As the foundation of an alternative claim, Montana reviewed BPA's power line under the Montana Major Facility Siting Act, Mont.Code Ann. Secs. 75-20-101 to -1205 (1983). That Act requires that power lines achieve "the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives." Mont.Code Ann. Sec. 75-20-301(2)(c) (1983). Montana determined that BPA's power line would not achieve "minimum adverse environmental impact" unless BPA conformed its construction and operation of the power line to a list of specific provisions for environmental protection. Montana expressly limited the application of the provisions to BPA's power line. One typical set of provisions in Montana's list delineated construction procedures designed to limit sediment erosion. Mont. Dep't of Natural Resources & Conservation, Construction Standards for 500 kV Townsend-Garrison Transmission Line Secs. 11.1-.13 (1982). Another set of typical provisions protected various species of wildlife from adverse impacts by imposing seasonal restrictions on construction. Id. at Secs. 8.1-.2; Mont. Bd. of Natural Resources & Conservation, Amended Conclusion and Final Determination p 1 (1982). Montana maintained that if Sec. 505(a)(iv) does not require state certification, Sec. 505(a)(iv) requires at a minimum that BPA comply with Montana's specific substantive provisions. The state's theory was that "minimum adverse environmental impact" is a "state standard for ... environmental protection" under Sec. 505(a)(iv); therefore, because Montana's specific provisions implement the state standard of "minimum adverse environmental impact," the provisions should apply to BPA derivatively.
 
 
 7
 The district court rejected Montana's claims. First, it relied on Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585 (9th Cir.1981), in holding that Sec. 505(a)(iv) of FLPMA does not require that BPA obtain state certification. Second, the court ruled that the general requirement of "minimum adverse environmental impact" is not a "state standard for ... environmental protection" because of its "inherent subjectiveness." Third, the district court considered whether Montana's specific substantive provisions might be "state standards for ... environmental protection" in their own right. The court concluded, however, that the provisions could not be "standards" because they had not been previously promulgated and did not have widespread application.
 
 
 8
 The federal government urges us to adopt the district court's position in this appeal. In addition, it argues that even if Sec. 505(a)(iv) requires state certification or compliance with Montana's substantive provisions for BPA's activities on federal lands, Sec. 505(a)(iv) does not authorize the Secretaries of Interior and Agriculture to restrict BPA's activities off federal lands. The utility companies that comprise the power consortium intervened as defendants. They argue that we should dismiss the case as unripe or moot.
 
 Analysis
 I. Justiciability
 
 9
 The defendant-intervenors argue that the appeal lacks ripeness because BPA may voluntarily comply with all of Montana's specific substantive requirements. They maintain that unless Montana shows that there exists real disagreement over a substantive requirement, adjudication of the merits of the appeal will merely give the parties an advisory opinion.
 
 
 10
 The defendant-intervenors' ripeness argument fails with respect to the state certification issue. Montana contends that BPA must obtain state certification, which BPA refuses to do. That disagreement is real and presents a ripe controversy.
 
 
 11
 The defendant-intervenors' ripeness argument also fails with respect to whether BPA must comply with Montana's substantive provisions on and off federal lands. "[T]he question of ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration' ". Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Both ripeness factors support justiciability. The compliance issue is fit for adjudication because it raises exclusively legal questions. There is hardship to the parties because Montana risks wasting extensive administrative resources if it determines BPA's compliance with its substantive provisions before receiving assurance that Sec. 505(a)(iv) of FLPMA requires that compliance.
 
 
 12
 The defendant-intervenors also contend that the appeal is moot because the power line will be energized before the appeal is decided. The contention lacks merit. We have the power to order the removal of the power line if we determine that it was constructed in violation of federal law. Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 591 n. 1 (9th Cir.1981). Therefore, the emplacement and activation of the line does not render the case moot. Id.
 
 II. State Certification
 
 13
 Montana asks us to rule that Sec. 505(a)(iv) of FLPMA requires that BPA obtain state certification before constructing the power line. Columbia Basin squarely confronted that issue and resolved it against the position Montana urges. There we held that Sec. 505(a)(iv) of FLPMA requires that BPA comply with state "substantive standards" but not with state procedural requirements. 643 F.2d at 604-05. Accord Citizens & Landowners Against the Miles City/New Underwood Powerline v. DOE, 683 F.2d 1171, 1179-80 (8th Cir.1982). Montana does not dispute that Columbia Basin is controlling; instead, it asks us to overrule Columbia Basin.
 
 
 14
 We reject Montana's request. We are bound by the decisions of prior panels. First Charter Financial Corp. v. United States, 669 F.2d 1342, 1347 (9th Cir.1982); Ellis v. Carter, 291 F.2d 270, 273 n. 3 (9th Cir.1961). Montana does not argue that any en banc decisions, Supreme Court decisions, or legislation subsequent to Columbia Basin undermine that case. Therefore, we have no power to overrule Columbia Basin.[1]
 
 III. Montana's Substantive Provisions
 
 15
 Alternatively, Montana argues that Sec. 505(a)(iv) of FLPMA requires that BPA comply with Montana's substantive regulations. Montana maintains that its general requirement of "minimum adverse environmental impact" is a "state standard for ... environmental protection" under Sec. 505(a)(iv) of FLPMA. Because the specific substantive provisions promulgated by Montana implement that standard, the state argues that the specific provisions must likewise apply to BPA.
 
 A. The General Provision
 
 16
 The district court held that Montana's broad requirement of "minimum adverse environmental impact" was too subjective and vague to serve as a "standard" for purposes of Sec. 505(a)(iv). We agree. By itself, the general requirement would be incapable of offering any guidance to the Secretaries of Interior and Agriculture. See Romero-Barcelo v. Brown, 643 F.2d 835, 855-56 (1st Cir.1981) (state nuisance law which prohibited unreasonably loud noises was too general to come within 42 U.S.C. Sec. 4903(b), which makes "state ... requirements respecting ... noise" applicable to federal instrumentalities), rev'd on other grounds, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).
 
 B. The Specific Provisions
 
 17
 Although Montana's broad requirement is not a "standard" under Sec. 505(a)(iv), at least if it stands by itself,[2] our inquiry does not end there. Montana has promulgated a host of detailed substantive provisions with which it wants BPA to comply. If those specific provisions are "state standards for ... environmental protection" in their own right, then Sec. 505(a)(iv) will make them directly applicable to BPA's activities on federal lands.
 
 
 18
 Whether Montana's specific substantive provisions are "state standards for ... environmental protection" in their own right turns on whether their ad hoc, route-specific nature prevents them from being "standards." The district court held that Montana's specific provisions were not "standards" because they had been adopted on an ad hoc basis. If the specific provisions were previously promulgated and if they regulated other power lines in Montana, the parties would agree that the provisions apply to BPA's activities on federal lands.
 
 
 19
 For three principal reasons, we hold that Montana's specific measures for environmental protection are "standards" despite their lack of previous promulgation and widespread applicability. First, the provisions which Montana seeks to impose upon BPA concretely regulate how BPA should construct and operate the power line. They therefore meet the ordinary conception of "standards." One provision requires that "[a]ll ruts made by machinery shall be filled to prevent channeling." Mont. Dep't. of Natural Resources & Conservation, Construction Standards for 500 kV Townsend-Garrison Transmission Line Sec. 11.5 (1982). Another typical measure specifies that 5.0 lbs/acre of Bluebunch wheatgrass must be reseeded on dry sites at high elevation after construction. Id. at Sec. 15.9. Such detailed regulation of future activities falls within the ordinary meaning of "standards."
 
 
 20
 Second, the structure of Sec. 505(a)(iv) of FLPMA confirms that "standards" should not be interpreted to require prior promulgation and widespread applicability. Section 505(a)(iv) differentiates between standards for public health, safety, and environmental protection on the one hand and standards for the siting, construction, operation, and maintenance of power lines on the other. The latter standards, but not the former, are applicable under Sec. 505(a)(iv) only if they apply "of or for rights-of-way for similar purposes." We interpret the quoted phrase to require that standards for siting, construction, operation and maintenance apply both to the federal rights-of-way and to the rights-of-way which cross state or private lands. If that requirement of general application were inherent in the term "standard," then "of or for rights-of-way for similar purposes" would be superfluous and would not distinguish standards for public health, safety, and environmental protection from standards for siting, construction, operation, and maintenance.[3]
 
 
 21
 Third, it accords better with the legislative intent to regard Montana's route-specific provisions as "standards" under Sec. 505(a)(iv). The language of Sec. 505(a)(iv) evinces the principal purpose of allowing states to impose more stringent measures for environmental protection on right-of-way grantees than the federal government requires.[4] The central purpose of more stringent environmental protection at the option of the state is furthered by according states the discretion to impose route-specific requirements on federal grantees. In many instances, a state could not effectively protect the environment if it were restricted to promulgating, in advance, quantifiable standards that apply in numerous instances. Because each power line crosses a unique environment, the trade-offs involved in environmental protection must frequently be made on an ad hoc, case-by-case basis. To take one example, protection of the environment often requires weighing the benefits of routing a power line away from an environmentally sensitive area against the costs of doing so.
 
 
 22
 The federal government argues that holding Montana's specific provisions to be "standards" under Sec. 505(a)(iv) is contrary to Columbia Basin because it subjects BPA, in substance if not in form, to the state certification process. The government points out that Hancock v. Train, 426 U.S. 167, 179, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976), and EPA v. State Water Resources Control Board, 426 U.S. 200, 211, 96 S.Ct. 2022, 2027, 48 L.Ed.2d 578 (1976), require a clear and unambiguous indication of congressional intent to subject the federal sovereign to such state regulatory power.
 
 
 23
 We do not find the government's arguments to be persuasive. In the first place, the proper construction of "standards" under Sec. 505(a)(iv) cannot be controlled by presumptions relating only to federal instrumentalities; section 505(a)(iv) applies to any entity, public or private, that obtains a right-of-way over federal lands.[5] In the second place, for federal authorities to impose Montana's route-specific requirements for environmental protection on BPA is a far cry from subjecting BPA to the state certification process. If BPA were required to obtain state certification, Montana could deny certification on the ground that the facility was unnecessary, was inconsistent with regional plans for expansion, or would not be sufficiently reliable. See Mont.Code Ann. Sec. 75-20-301(2)(a), -301(2)(e)(ii), -301(2)(e)(iii) (1983). Holding that Montana may impose ad hoc measures for environmental protection upon BPA affords Montana none of those powers.[6] If anything, Columbia Basin supports Montana's authority to impose route-specific requirements on BPA. We ruled in Columbia Basin that BPA had to comply with Washington's substantive standards for environmental protection. Washington, however, regulates power lines on the same ad hoc basis as does Montana. See Wash.Rev.Code Ann. Secs. 80.50.010-.50.902 (West.Supp.1983). If we did not regard ad hoc provisions as "standards" under Sec. 505(a)(iv), our ruling in Columbia Basin would have been an exercise in futility.[7]
 
 
 24
 We hold that Montana's specific measures for environmental protection are "state standards for ... environmental protection" in their own right under Sec. 505(a)(iv) of FLPMA. Therefore, Montana's specific measures are directly applicable to BPA's activities on federal lands.
 
 IV. Off Federal Lands
 
 25
 Montana argues that Sec. 505(a)(iv) of FLPMA requires that the Secretaries of Interior and Agriculture condition the rights-of-way issued to BPA upon BPA's compliance with Montana's substantive provisions off federal lands. Montana asserts that it is absurd to hold that BPA must comply with Montana's substantive requirements on federal land, but not on state or private land where the state's interest is greater and the federal interest less.
 
 
 26
 The language of Sec. 505(a)(iv) could bear Montana's interpretation. Section 505(a)(iv) does not expressly limit the applicability of the right-of-way conditions to federal lands. Although the legislative history supports limiting their applicability, it is not determinative. The Senate version of FLPMA provided that "[t]he Secretar[ies] shall ... insure that activities on the right-of-way will not violate applicable air and water quality standards or applicable transmission, powerplant, and related facility siting standards." S. 507, 94th Cong., 1st Sess. Sec. 403(d)(1) (1975) (emphasis added). Clearly the limiting phrase "on the right-of-way" expresses a Senate intent to limit the conditions imposed on rights-of-way to federal lands. However, the phrase was dropped without explanation from the enacted version of FLPMA. To resolve the federal lands issue, we must look outside Sec. 505(a)(iv)'s express language and recorded legislative history.
 
 
 27
 Montana's position might be persuasive if Sec. 505(a)(iv) applied exclusively to rights-of-way issued to federal instrumentalities. Section 505(a)(iv), however, applies to all rights-of-way grantees, public or private. When it is recognized that Sec. 505(a)(iv) applies to private grantees, Montana's position becomes untenable. If, as Montana argues, Sec. 505(a)(iv) requires that the Secretaries condition rights-of-ways upon grantee compliance with state standards off federal lands, then Sec. 505(a)(iv) places on federal shoulders the duty of insuring that private entities comply with state requirements on state and private land. That is a result which Congress could not have intended. Therefore, we conclude that the obligations of the Secretaries of Interior and Agriculture under Sec. 505(a)(iv) are limited to federal lands.[8]
 
 
 28
 The application of Sec. 505(a)(iv) to the facts of this appeal may produce a strange result.[9] We cannot avoid that result, however, by inserting into Sec. 505(a)(iv) an obligation which Congress excluded.
 
 CONCLUSION
 
 29
 We affirm the district court's holding that BPA need not obtain state certification before constructing and operating the Townsend to Hot Springs power line. We also affirm the district court's holding that BPA need not comply with Montana's substantive provisions off federal lands. We reverse, however, the district court's determination that BPA need not comply with Montana's specific substantive provisions for environmental protection while engaged in activities on federal lands. Those specific substantive provisions are "state standards for ... environmental protection," applicable to BPA through Sec. 505(a)(iv) of FLPMA.
 
 BOOCHEVER, Circuit Judge, dissenting in part:
 
 30
 I agree with Judge Canby's opinion except for the holding that the ad hoc, route-specific requirements constitute state standards for the purposes of section 505(a)(iv). I believe that the district court was correct in defining "standard", as implying some type of preexisting, tangible, objective criteria.
 
 
 31
 Although there is a dearth of reported cases construing the term "standard," Romero-Barcelo v. Brown, 643 F.2d 835 (1st Cir.1981), rev'd on other grounds, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), supports the district court's construction. The First Circuit held that a state nuisance law which prohibited unreasonably loud noises was too general to constitute a "requirement" as used by Congress in section 4 of the Noise Control Act, 42 U.S.C. Sec. 4903(b). That act provides that federal agencies must comply with state "requirements" for control and abatement of environmental noise. The court reasoned that the word "requirements" contemplates specific, uniform standards rather than general standards that require case-by-case determinations. Id. at 855-56.
 
 
 32
 More closely in point is Citizens and Landowners Against the Miles City/New Underwood Powerline v. U.S. Dept. of Energy, 683 F.2d 1171 (8th Cir.1982), in which an attempt was made to require the Western Area Power Administration to comply with South Dakota right of way requirements on a case-by-case basis. South Dakota laws provided for general criteria similar to Montana's "minimum adverse environmental impact" requirement, id. at 1181-82 n. 20, and again, like Montana, sought to tailor the requirements to the specific project. The court pointed out that the substantive standards were to be determined by the state on a case-by-case basis through the permit application procedure. The Eighth Circuit, following our decision in Columbia Basin, held that South Dakota could not impose procedural compliance. It, however, rejected the South Dakota Commission's ad hoc orders as tantamount to requiring compliance with the state's procedural requirements. Id. at 1182.
 
 
 33
 Congress has provided that federal departments give due consideration to state needs. Where practical, they must attempt to resolve conflicts through consultation with appropriate state officials. 42 U.S.C. Sec. 7113. But Congress has not otherwise provided for accommodation of state ad hoc, case-by-case requirements. I therefore would affirm the district court's decision that compliance with such requirements is not mandated by the Federal Land Policy & Management Act.[1]
 
 
 
 [1]
 Montana's argument is weak even if evaluated on the merits. Montana argues that a 1977 amendment to the Clean Air Act, Pub.L. No. 95-95, Title I, Sec. 116, 91 Stat. 685, 711 (codified at 42 U.S.C. Sec. 7418(a) (1982)), and a 1977 amendment to the Federal Water Pollution Control Act, Pub.L. 95-217, Sec. 61(a), 91 Stat. 1566, 1598 (codified at 33 U.S.C. Sec. 1323(a) (1982)), show that Congress intended that applicants for rights-of-way under FLPMA obtain state certification. Although the 1977 amendments do require federal instrumentalities to comply with the procedural provisions of the state air and water pollution laws, we do not regard amendments by a subsequent Congress to different statutes as bearing on the proper interpretation of FLPMA
 
 
 [2]
 Montana argues that its general requirement of "minimum adverse environmental impact" should be regarded as a "standard" under Sec. 505(a)(iv) when, as here, the general requirement is accompanied by specific implementing regulations. In view of our holding below that the specific implementing regulations are "standards" in their own right, we need not address that argument
 
 
 [3]
 Most of Montana's substantive provisions for environmental protection regulate the construction process. It could be argued that those provisions should be treated exclusively as construction standards. So treated, the provisions would not be directly applicable to BPA through Sec. 505(a)(iv) because the provisions do not apply to rights-of-way which cross state or private lands
 We reject that argument. Siting, construction, operation, and maintenance exhaust the steps involved in the transmission of electricity across federal lands. If we held that any standard for public health, safety, or environmental protection which also regulates siting, construction, operation, or maintenance must be treated exclusively as a siting, construction, operation, or maintenance standard, no standard would receive treatment as a standard for public health, safety, or environmental protection under Sec. 505(a)(iv). Our position does not render nugatory the distinction between standards for public health, safety, and environmental protection and standards for siting, construction, operation, and maintenance. There are some standards, for instance standards specifying the terms and conditions of employment, which will be siting, construction, operation, or maintenance standards without being standards for public health, safety, or environmental protection.
 
 
 [4]
 The legislative history does not expand upon the purpose evident in the statutory language. The requirement that federal grantees comply with state standards for public health, safety, and environmental protection was added to FLPMA during the course of the House debates. 122 Cong.Rec. 7620-21 (1976). Neither those debates nor the subsequent Conference Report, H.R.Rep. No. 1724, 94th Cong., 2d Sess. 65 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 6175, 6228, 6236, elaborate upon the meaning of the express language in Sec. 505(a)(iv)
 
 
 [5]
 BPA does not contend that federal instrumentalities are wholly beyond the reach of Sec. 505(a)(iv). Nor could it, in view of Columbia Basin, 643 F.2d at 598-601, and Citizens & Landowners Against the Miles City/New Underwood Powerline v. DOE, 683 F.2d 1171, 1179 (8th Cir.1982). Section 507(a) of FLPMA, 43 U.S.C. Sec. 1767(a) (1976), authorizes the Secretaries of Interior and Agriculture to provide rights-of-way to federal agencies "under applicable provisions of this subchapter"; Sec. 505(a)(iv) is an "applicable provision" and accordingly applies to federal instrumentalities
 
 
 [6]
 A right-of-way grantee that believes that the state's measures for environmental protection reflect the state's desire to veto the power line, and not a true concern for environmental protection, may, of course, bring its claim before an appropriate court
 
 
 [7]
 The dissent suggests that the Eighth Circuit considered and rejected the argument that route-specific provisions are "standards" under Sec. 505(a)(iv), citing Citizens & Landowners Against the Miles City/New Underwood Powerline v. DOE, 683 F.2d 1171 (8th Cir.1982). There, however, the state contended that the only way that it could enforce site-specific regulations was to subject the federal grantee to state licensing procedures. The Eighth Circuit held, as we do, that the federal agency could not be subjected to state procedural requirements. Id. at 1181-82
 
 
 [8]
 Columbia Basin confirms our interpretation of Sec. 505(a)(iv). There we held that BPA need not obtain a federal right-of-way for construction activities off federal lands. 643 F.2d at 601-02. It would undermine that holding to read Sec. 505(a)(iv) as nonetheless requiring the Secretaries of Interior and Agriculture to regulate BPA's activities off federal lands
 
 
 [9]
 Our holding will not necessarily produce the absurd result which Montana fears. The Energy Act requires that BPA "give due consideration" to Montana's energy plan. 42 U.S.C. Sec. 7113 (Supp. I 1977). That Act, or some other provision of federal law, may impose an obligation on BPA to comply with Montana's substantive standards off federal lands. But cf. Citizens and Landowners Against the Miles City/New Underwood Powerline v. DOE, 683 F.2d 1171, 1180-81 (8th Cir.1982) (the Energy Act does not impose a duty upon the Western Area Power Administration, BPA's sister administration, to comply with state certification procedures). In addition, section 507(a) of FLPMA, 43 U.S.C. Sec. 1767(a) (1976), would appear to give the Secretaries the discretion, although not the duty, to require BPA compliance with Montana's substantive provisions
 
 
 [1]
 The majority correctly states that in Columbia Basin we held that the BPA had to comply with Washington substantive standards. That case, however, does not consider the issue before us now of whether state route-specific ad hoc requirements may be enforced as standards